**SO ORDERED.**

**SIGNED this 27 day of March, 2015.**

_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:

SHRI SAIBABA, LLC                                    CASE NO. 14-01403-5-DMW

                DEBTOR                                    CHAPTER 11

### ORDER VALUING COLLATERAL

This matter comes on to be heard upon the Motion for Valuation of Collateral ("Motion") filed by New Peoples Bank, Inc. ("NPB") on December 2, 2014, and the response filed by Shri Siababa, LLC ("Debtor"). The court conducted a hearing in Raleigh, North Carolina on January 28, 2015. James A. McLean III, Esq. appeared for NPB, and J.M. Cook, Esq. appeared on behalf of the Debtor. Based upon the evidence presented and the arguments of counsel, the court makes the following findings of fact and conclusions of law:

A.    BACKGROUND

1. The Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on March 10, 2014. The Debtor is operating as a debtor-in-possession consistent with 11 U.S.C. § 1107.

  2. The Debtor owns a motel complex ("Motel") known as America's Best Value Inn in Smithfield, North Carolina. The Motel faces Interstate 95 ("I-95") on the east side at Exit 95. The Motel consists of a 7.84 acre parcel with three buildings totaling 24,794 square feet and 60 rooms. Approximately 50 of the rooms are currently in rentable condition.

  3. The Motel secures a debt to NPB. NPB filed a proof of claim on May 23, 2014, asserting a secured claim in the amount of $1,673,591.89.

  4. On Schedule D filed with the court, the Debtor valued the Motel at $1,400,000.00. The Debtor filed a Chapter 11 Plan of Reorganization ("First Plan") on June 10, 2014. The First Plan proposed to treat NPB's claim as secured to the extent of $1,000,000.00, with any remaining portion of NPB's claim to be treated as a general unsecured claim.

  5. On July 30, 2014, NPB filed an Objection to Confirmation of Plan, Objection to Disclosure Statement, and Objection to Valuation of Collateral.

  6. On October 20, 2014, the Debtor filed a Second Chapter 11 Plan of Reorganization ("Second Plan") valuing the Motel at $580,000.00. On December 1, 2014, NPB filed a second Objection to Confirmation of Plan, Objection to Disclosure Statement, and Objection to Valuation of Collateral ("Objection"). The court postponed the hearing on confirmation of the Second Plan until it can determine the value of the Motel.

  7. Consistent with the Second Plan, the Debtor asserts in the Motion the Motel is worth $580,000.00. NPB asserts the value is $900,000.00. As discussed below, the court finds the value to be $820,000.00.

B. <u>JURISDICTION</u>

  1. This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.

2. The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

C. DISCUSSION

1. <u>NPB Appraisal</u>  In support of its valuation, NPB tendered an appraisal ("NPB Appraisal") prepared for NPB by Tom J. Keith & Associates, Inc. through Mr. Brendon Wills ("Mr. Wills"), an employee of Tom J. Keith & Associates, Inc.  The court designated Mr. Wills as an expert witness in the field of commercial real estate appraisals.  In offering a value of $900,000.00, Mr. Wills used the industry standards of income approach, cost approach, and market approach.  Mr. Wills' calculations are based on an indication that only 50 rooms are rentable.

    a. <u>Income Approach</u>

    i. The income approach converts anticipated benefits to be derived from the ownership of the property into a value opinion.  The NPB Appraisal determined a value of $865,000.00 using the income approach; however, the NPB Appraisal only uses figures from 2010, 2011, and 2012 and does not include figures from 2013.  Mr. Wills testified at the hearing that he did not have access to the 2013 data and could not use those amounts in his calculations.

    ii. The 2013 data is vital to understanding the income-producing capabilities of the Motel.  For example, the Motel saw an increase in gross revenue of 14% between years 2010 and 2011 and 16% between years 2011 and 2012.  The NPB Appraisal says "The projected 2014 revenue is based on the growth in income from 2010 to 2012 which indicates growth of approximately

3

15% per year." This assumption is incorrect because according to the Debtor's Appraisal (as defined below), the Debtor actually saw a 7% decline in gross revenue between years 2012 and 2013. The failure to use the most recent income figures for 2013 and the assumption of 15% annual growth make the income approach in the NPB Appraisal unreliable.

b. <u>Cost Approach</u>

i. The cost approach is an analysis that is based on the idea that an informed purchaser would pay no more than the cost of producing a substitute property with the same utility as the subject property. The NPB Appraisal calculates a value of $950,000.00 using the cost approach.

ii. The cost approach calculates the estimated value of the land, and estimates the reproduction or replacement cost of the improvements, other costs incurred after construction to bring the building to market condition, and entrepreneurial profit. The appraiser then adds all of these estimates together to arrive at a total cost of the main structure. Depreciation is then estimated to determine the amount of accrued depreciation in the structure according to physical deterioration and functional or external obsolescence. The depreciation amounts are deducted from the total cost of the main structure to achieve a final value.

iii. As the Debtor's Appraisal states, and as not contested by Mr. Wills, this method is most reliable for newer properties. The Motel is 52 years old, and the NPB Appraisal factors a 90% depreciation to the total cost of the main structure. The application of a large depreciation amount to arrive at the

value of the Motel leads to a less reliable valuation.

c.  <u>Market Approach</u>

i. The market approach makes a direct comparison of the subject property with other similar properties that have recently sold. The properties are compared on a point-by-point basis and adjustments are made for differences in location, size, site value, vehicular traffic and other relevant factors. To determine value under a market approach, land value and improvement value are considered.

ii. The market approach in the NPB Appraisal examines five comparison properties in Kinston, NC ("NPB Sale 1"), Selma, NC ("NPB Sale 2"), Burlington, NC ("NPB Sale 3"), Whiteville, NC ("NPB Sale 4") and Smithfield, NC ("NPB Sale 5"). Mr. Wills testified that the most important factors in finding comparable sales were location relative to a highway and the age of the properties.

iii. The NPB Appraisal accounted for various factors to determine a per room price and a per square foot price. The per room method accounted for a value of $18,000.00 per room, or $900,000.00, and the square foot method accounted for a value of $40.00 per square foot, or about $990,000.00. Mr. Wills testified that the per room price is most common in lodging sales.

iv. Many of these comparison properties require too many adjustments in order to make the sale comparable. For instance, NPB Sale 1 is roughly 8,000 square feet smaller than the Motel but has only two fewer rooms. Also, NPB Sale 1 does not have the interstate highway frontage of the Motel, but no adjustment is

5

made for this relevant difference. NPB Sale 3 is 40,000 square feet larger than the Motel and has 81 more rooms, which results in an attempt to compare the Motel with a facility that is roughly 260% larger. NPB Sale 4 is also significantly different than the Motel. It is over 100 miles from the Motel, cannot be seen from a major highway, is 24 years newer, and has 41 more rooms. NPB Sale 5 involves a building that has only 16 rooms (68% less than the Motel) and only 8,000 square feet (68% less than the Motel). Although NPB Sale 5 is in the same municipality as the Motel, NPB Sale 5 requires too many adjustments to be a reliable comparable.

    v.  The most comparable sale listed in the NPB Appraisal is NPB Sale 2, which sold for $600,000.00 on December 16, 2013. NPB Sale 2 is in the same county as the Motel (Johnston County, North Carolina), has a similar building size, and has major highway frontage along I-95. While not an ideal comparable, it is the best one available because of fewer adjustments. The main difference between NPB Sale 2 and the Motel is the number of rooms. Mr. Wills testified that generally, smaller quantities (rooms or square feet) sell for a higher price per unit.

  2. <u>Debtor's Appraisal</u>  The Debtor introduced an appraisal ("Debtor's Appraisal") at the hearing, prepared for the Debtor by HK Meridian, Inc. Ms. Kelly Mayhew ("Ms. Mayhew") was tendered and certified as an expert witness in the field of appraising lodging facilities and testified regarding the Debtor's Appraisal. The Debtor's Appraisal valued the Motel at $580,000.00. Ms. Mayhew used two approaches to reach this value: the income approach and the market approach. All of Ms. Mayhew's calculations on are based on the Motel's complete

capacity of 60 rooms.

    a.    <u>Income Approach</u>

        i.    The Debtor's Appraisal reaches a value of $570,000.00 using the income approach. To calculate the value, the Debtor's Appraisal estimates the revenue and expenses of the Motel to determine an estimated profit. This estimated profit is then applied to a formula to create a value. The accounting information used to reach this value is erroneous.

        ii.    To estimate revenue, the Debtor's Appraisal considers local occupancy rates, total rooms, and an average room rate to estimate yearly revenue at $283,605.00. This estimate is defective in two ways. First, the revenue estimate calculates the revenue using 60 rooms; however, according to the testimony from Mr. Wills, only roughly 50 rooms are rentable. The other 10 rooms are either used by the Debtor for other purposes or are not suitable for nightly rental. For income purposes, the calculation can only be accurate by calculating the usable rooms. Reducing the calculation by 10 rooms adjusts the estimated revenue to $236,337.50 (this amount is lower than the actual revenue in 2011, 2012, and 2013). Using the local standards for revenue rather than actual revenues leads to an unreliable income valuation.

        iii.    Ms. Mayhew testified that even though some rooms are not usable, investors will look at the complete potential use of the property. This assumption does not consider the expense that must be incurred to convert the rooms into saleable inventory, and that capital need may alter the value.

        iv.    Ms. Mayhew testified that the Motel's average occupancy rate is

7

31.40%. This average "house count" means that the Motel is hardly at full occupancy. It does not appear that the income approach considered the actual and historical room sales.

      v.      Using local occupancy rates and the number of rooms available for sale to create a revenue estimate is flawed. Adding more rooms does not mean that the revenue will grow proportionally.

      vi.      The Debtor's Appraisal creates a projected analysis of future expenses based on the Motel's historical operating expenses and those of similar properties. The figures used as estimated expenses vary significantly from an average of the Motel's actual expenses in years 2010-2013. For instance, the Debtor's Appraisal estimates the utilities to be $24,106.00 per year while the Motel has spent an average of $44,996.25 per year in the four previous years, according to conflicting information in the Debtor's Appraisal. Additionally, the Debtor's Appraisal estimates the Motel's payroll to be $70,901.00 when actually, the Motel has spent an average of $30,205.50 on payroll in the four previous years.

      vii.      When adding estimated gross revenues, based on an average annual growth of 8%, to estimated expenses based on a four-year historical average, the net profit in years 2014 and 2015 is ($24,008.32) and ($1,971.57), respectively.

      viii.      Ms. Mayhew testified that investors use local data to determine the potential profit of an acquisition; however, the local data is not even close to the Debtor's historical figures. Further, the Debtor does not intend to change

management and is not planning on selling the Motel. The proposition that another manager or purchaser could dramatically change the Debtor's operations, such as reducing the annual utility bill by $20,000.00, is not relevant to current value. The Debtor's income approach is unreliable and will not be used to determine the value of the Motel.

    b.    <u>Market Approach</u>

        i.    The Debtor's Appraisal uses four comparable sales in Rocky Mount, NC ("Debtor Sale 1"), Rockingham, NC ("Debtor Sale 2"), Claremont, NC ("Debtor Sale 3"), and Farmville, NC ("Debtor Sale 4") to calculate a market value of $600,000.00. However, the four comparable sales have differences that required significant adjustments before they were useful for determining a value for the Motel. These differences are too significant to calculate a reliable value.

        ii.    Debtor Sale 1 is six miles away from I-95. This distance is a major variance from the Motel's I-95 frontage. Debtor Sale 2 is located in a downtown area. Properties located in destinations (downtown areas) are significantly different from properties adjacent to an interstate highway, leading to difficulties in adjusting values. Debtor Sale 3 is only 27 years old which is approximately half the age of the Motel. Debtor Sale 4 is also far from a major highway and most definitely not facing an interstate highway. Additionally, Debtor Sale 4 has a less enticing facade and is less inviting to the average consumer. Based on each of the substantial differences between the comparable sales and the Motel, the Debtor's market approach will be given little consideration in establishing the value.

3.  <u>Reconciliation</u>  To determine the value of the Motel, the court will examine the most reliable comparable sale price presented in the appraisals – NPB Sale 2 – to determine a building value and a land value. The income approach has proven to be unreliable and will not be examined. Additionally, the cost approach, because it requires a 90% depreciation, will not be used to determine a value.

   a.  <u>Building Value</u>

   i.  NPB Sale 2 involves an economy chain motel (Econo-Lodge) in the same county as the Motel and only one exit away on I-95. Additionally, NPB Sale 2 has only 2,865 more square feet than the Motel and is in the same "average" condition as the Motel.

   ii.  The only significant difference between the two properties is that NPB Sale 2 has 114 rooms while the Motel has only 50 usable rooms. The difference in the sales price can be determined using a discount or percentage based upon the number of rooms.

   iii.  Because of the difference in the number of rooms, it makes the most sense to value the Motel on a per room cost, rather than a per square foot cost. NPB Sale 2 sold for a total of $600,000.00 with an estimated land value of $240,000.00. Deducting the land value from the total sale price gives the building a price of $360,000.00. When divided by the number of rooms, each room is valued at $3,158.00. When the NPB Sale 2 per room price is applied to the Motel, the building value is $157,900.00. This estimate is conservative because Mr. Wills testified that properties with fewer rooms traditionally sell for a higher per room price.

    iv. The only other significant difference between NPB Sale 2 and the Motel is the age. NPB Sale 2 was 39 years old when sold and the Motel is 52 years old. According to the NPB Appraisal, this age difference creates a 3% difference in the depreciation of the building. Although this difference is marginal, it is important because the age affects the useful life of the building. Applying that discount to the per room price, the Motel value should be reduced by 3%, or $4,737.00, for a total building value of $153,163.00.

  b. <u>Land Value</u>

    i. The value of the vacant land is important to the overall value of the Motel because the Motel building is towards the end of its effective economic life. The only appraisal that included valuations for vacant land was the NPB Appraisal, which compared five vacant land sales and came up with a value of $85,000.00 per acre. Mr. Wills testified that the most comparable vacant land sales were Land Sale 2 and Land Sale 4, located in Sedalia, NC and Smithfield, NC, respectively. Land Sale 2 had similar highway frontage and similar traffic patterns to the Motel. Land Sale 4 was at the same interchange as the Motel but on a more developed side of the interchange.

    ii. After minimal adjustments[1] to make the sales comparable, Land Sale 2 provided an adjusted value of $84,024.00 per acre and Sale 4 provided an adjusted value of $84,911.00 per acre. In sum, using all the reliable figures for the price of the vacant land, it is reasonable to calculate the value of the Motel's land at $85,000.00 per acre, for a total of $666,400.00.

---

[1] Land Sale 2 was marginally adjusted for size. Land Sale 4 was adjusted for size and location/traffic count.

      iii. Adding the determined total land value to the determined total building value creates a final value of $819,563.00, which the court rounds to $820,000.00; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1. The value of the Motel is $820,000.00, and NPB shall have a secured claim in that amount;

2. The balance of NPB's claim will be treated as a general unsecured claim; and

3. The Debtor may amend its Second Plan to reflect the value of the Motel.

END OF DOCUMENT